## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ROY WALLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:20-cv-06090 |
| ) | |
| NDF1, LLC; ) | |
| LAND HOME FINANCIAL ) | |
| SERVICES, INC.; and ) | |
| FCI LENDER SERVICES, INC.; ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

## INTRODUCTION

1.      Plaintiff Roy Waller brings this action to address a time-barred mortgage that is clouding the title to his home.

2.      Plaintiff also seeks damages for violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"), the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"), the Real Estate Settlement Procedures Act, 12 U.S.C. §2605 ("RESPA"), the Illinois Interest Act, and the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA") and implementing Regulation Z, 12 C.F.R. part 1026.

## VENUE AND JURISDICTION

3.      This Court has jurisdiction under 28 U.S.C. §1332 (diversity), 28 U.S.C. §1331 (general federal question),  28 U.S.C. §1337 (interstate commerce), 15 U.S.C. §1692k (FDCPA), 12 U.S.C. §2605 (RESPA), 15 U.S.C. §1640 (TILA), and 28 U.S.C. §1367 (supplemental jurisdiction).

4.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      As set forth below, the parties are of diverse citizenship.

6.      Venue and personal jurisdiction in this District are proper because:

a.      Each Defendant's communications and statements were received by

-1-

Plaintiff within this District;

b.    Each Defendant does or transacts business within this District;

c.    The action concerns real estate within this District.

## PARTIES

7.    Plaintiff Roy Waller is a citizen of Illinois and resides in a home which he owns in Downers Grove, Illinois.

8.    Defendant NDF1, LLC is a limited liability company organized under Virginia law with offices at 556 Garrisonville Road, Suite 202, Stafford, VA 22554. It does business in Illinois. Its registered agent and office is Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

9.    NDF1, LLC describes itself as "a private mortgage management company specializing in defaulted residential mortgages across the United States." (NDF1, LLC "Welcome Packet," Appendix A, p. 2)

10.    NDF1, LLC acquires defaulted residential mortgage loans and attempts to liquidate them by dunning and litigation.

11.    On information and belief, NDF1, LLC has no other source of revenue.

12.    On information and belief, NDF1, LLC is owned by Martin J. Saenz and Shawn Muneio, each of whom is a citizen of Virginia and neither of whom is a citizen of Illinois. NDF1, LLC is therefore a citizen of Virginia for diversity purposes.

13.    NDF1, LLC uses the mails, telephone system and Internet in conducting a business, the principal purpose of which is debt collection.

14.    NDF1, LLC is a debt collector as defined in the FDCPA.

15.    Defendant Land Home Financial Services, Inc. ("Land Home"), is a corporation organized under the law of California with principal offices at 1355 Willow Way, Ste. 250, Concord, CA 94520-8113. It does business in Illinois.

16.    Defendant Land Home holds itself out as a "special servicer," which is mortgage

industry jargon for a servicer that specializes in loans that are delinquent when the servicer gets them, as opposed to performing loans. (https://servicing.lhfs.com/loan-servicing)  It has a "Special Servicing Division."  (https://servicing.lhfs.com/contact)

17.     Defendant Land Home regularly collects defaulted residential mortgage loans for others.

18.     Defendant Land Home uses the mails, telephone system and Internet in conducting business.

19.     Defendant Land Home is a debt collector as defined in the FDCPA.

20.     Defendant Land Home services more than $1 million in residential mortgage loans.

21.     Defendant FCI Lender Services, Inc. ("FCI"), is a corporation organized under California law with its principal offices at 8180 E. Kaiser Blvd., Anaheim Hills, CA 92808.  It does business in Illinois.  Its registered agent and office is Cogency Global Inc., 600 South Second St., Suite 404, Springfield, IL 62704.

22.     Defendant FCI holds itself out as a "special servicer." (https://www.trustfci.com/) "On this program FCI is the Sub-Servicer acting at the direction of its Lender Clients (Owner of the Notes) to address Non-Performing Loans by facilitating the restructure of loans per Lender directions, presenting Lender offered FPA's (Foreclosure Prevention Alternatives), or by Providing Foreclosure Support if workouts are not possible, so the Lender can get back and sell the properties. It is staffed by experts at skip trace, collection, Foreclose Prevention Alternative workouts, and foreclosures."  (https://www.trustfci.com/SpecialtyLoanServicing.html)  A "non-performing loan" is defined by FCI as "any Loan that has missed the 3rd payment, or more." (https://www.trustfci.com/SpecialtyLoanServicing.html)

23.     Defendant FCI  regularly collects defaulted residential mortgage loans for others.

24.     Defendant FCI uses the mails, telephone system, and Internet in conducting business.

25.     Defendant FCI is a debt collector as defined in the FDCPA.

26.     Defendant FCI services more than $1 million in residential mortgage loans.

## FACTS

27.     On or about November 16, 2006, Plaintiff obtained an open-end line of credit from Quicken Loans, Inc., secured by a mortgage.  <u>Appendix B</u> is the credit agreement. <u>Appendix C</u> is the mortgage.

28.     Quicken Loans, Inc., made more than 26 loans to consumers per year and was a creditor as defined in TILA and Regulation Z.

29.     The line of credit was used primarily for personal, family or household purposes. Most of the funds obtained were used to pay Plaintiff's household bills and expenses or were given to Plaintiff's brother for the purpose of putting a down payment on a house to be used by the brother as a residence.

30.     The line of credit agreement provided (paragraph 1) that "Lender will make loan advances up to my Maximum Available Credit for 10 years from the date of this Agreement."

31.     The line of credit agreement provided (paragraph 2) that loan advances could be requested and authorized by telephone and/or checks.

32.     The line of credit agreement did not provide for installments or a fixed repayment schedule.  Instead, it provided that each month in which there was an amount owed in excess of $1, the Lender would send the borrower a monthly statement giving a minimum amount that would have to be paid (paragraph 4).  The amount of the minimum monthly payment was dependent on the amount of credit used and the interest rate (paragraph 7).  The borrower could pay more than the minimum monthly payment.  All sums loaned would be repaid within 30 years from the date of the agreement (paragraph 2).

33.     The line of credit agreement provided for a variable interest rate of  2.125% above the prime rate as reported in the Wall Street Journal for the first day of each billing cycle or if no rate was published on that day, the most recent one (paragraph 9).

34.     The line of credit agreement provided (paragraph 20) that the lender could either decline further advances or reduce the credit limit if "the value of the Security declines significantly below the value for which it is appraised or valued when the Account was opened," or "Lender reasonably believes that I will be unable to make the payments required under this Agreement because of a material change in my financial condition," or the borrower defaults.

35.     The lender was permitted to change the terms upon notice, without agreement (paragraph 24), if the change was "insignificant" or "unequivocally be to my benefit."

36.     Because the amount owed was dependent on the use of the account, if any, it was not possible to ascertain from any document what the borrower's obligations were.

37.     The open end line of credit agreement functioned in a manner similar to a credit card agreement.

38.     No payments on the line of credit agreement had been made by Plaintiff or anyone  else since June 2008.

39.     Plaintiff had encountered financial difficulties at that time and had been unable to make further payments on the line of credit.  Eventually Plaintiff's first mortgage also went into default and a foreclosure was filed, but he was able to reinstate it.

40.     NFD1 claims to be the present owner of the debt.

41.     NDF1 claims to have acquired the debt on August 8, 2019.  On September 13, 2019, Land Home, as servicer of the debt, sent Plaintiff a "Notice of Sale or Ownership of Mortgage Loan" (Appendix D) so stating.  The Notice directed Plaintiff to "continue" making payments to Land Home.

42.     Land Home claims to have acquired servicing of the debt on September 10, 2019. On September 13, 2019, Land Home sent Plaintiff a "Notice of Assignment, Sale, or Transfer of Servicing Rights"  (Appendix E) so stating.  The Notice directed Plaintiff to make payments to Land Home.

43.     Land Home claims to have been the servicer of the debt until about August 21,

2020.

44.     All actions of Land Home as servicer of the debt were carried out on behalf of NDF1, LLC, as its agent.

45.     On August 12, 2020, Land Home sent Plaintiff a letter (Appendix F) stating that payment of $193,018.35 was required to pay off the line of credit and obtain a release of the mortgage.  The letter also stated that the next payment due was that for July 1, 2008, that the current interest rate was 7.625%, and that the per diem interest amount was  $20.89.

46.     The correct current interest rate on August 12, 2020 was not 7.625%.  As noted above, the credit agreement provided that the interest rate would be the Wall Street Journal rate plus 2.15%.  Since March 16, 2020, the prime rate has been 3.25%.  Furthermore, the prime rate has not been as high as 5.510%  – the rate that produces 7.625% under the formula in the credit agreement  – at any time since March 18, 2008.  The excess interest amounted to over $2,000 per year.

47.     On information and belief, other numbers in the August 12, 2020 letter, such as the interest balance and total debt,  were affected by the incorrect interest rate, and were inflated.

48.     On information and belief, when Land Home acquires servicing of an adjustable rate mortgage loan, it does not regularly check (a) the credit agreement, (b) the account history, (c) the interest rate and (d) the index to which the interest rate is tied in the credit agreement, to make sure that it is adding interest in a manner consistent with the credit agreement.  Plaintiff has no reason to believe that he was singled out from other borrowers for improper treatment.

49.     On August 18, 2020, Land Home sent Plaintiff a "Mortgage Statement" (Appendix G), which stated that "Failure to bring your loan current may result in fees and foreclosure  – the loss of your home.  As of August 17, 2020, you are 4,431 days delinquent on your mortgage loan."

50.     This statement again gave a current interest rate of 7.625%, and indicated that interest was continuing to be added to the alleged debt.

51. The correct current interest rate on August 18, 2020 was not 7.625%. As noted above, the credit agreement provided that the interest rate would be the Wall Street Journal rate plus 2.15%. Since March 16, 2020, the prime rate has been 3.25%.

52. On information and belief, other numbers in the "Mortgage Statement" were affected by the wrong interest rate.

53. On information and belief, other similar Mortgage Statements containing similar language and incorrect numbers were sent to Plaintiff by Land Home on behalf of NDF1.

54. As of August 17, 2020, no payments had been made on the line of credit agreement for more than 12 years.

55. The statement that "Failure to bring your loan current may result in fees and foreclosure – the loss of your home" was false, as any action on the debt or the mortgage was barred by limitations.

56. The "Mortgage Statement" did not disclose that the debt was time-barred, that any action on the mortgage was also time-barred, and that any payment made in response could restart the statute of limitations.

57. It is the practice of NDF1 and Land Home to not disclose when debts are time-barred, or that any payment made in response could restart the statute of limitations.

58. The applicable statute of limitations on the credit agreement was five years from default or last payment, whichever was later, under 735 ILCS 5/13-205, as in the case of a credit card. *Portfolio Acquisitions, L.L.C. v. Feltman,* 391 Ill. App. 3d 642, 909 N.E.2d 876 (1st Dist. 2009).

59. "[L]ong-standing Illinois law precludes a plaintiff from foreclosing on a mortgage when an action on the underlying note is barred by the statute of limitations or another procedural rule." *United Cent. Bank v. KMWC 845, LLC,* 800 F.3d 307, 311 (7th Cir. 2015), citing *Hibernian Banking Ass'n v. Commercial Nat. Bank,* 157 Ill. 524, 41 N.E. 919, 922 (1895).

60. About August 21, 2020, FCI Lender Services, Inc., notified Plaintiff that it was

the new servicer of the debt. ("Borrower Welcome Letter," <u>Appendix H</u>; "Notice of Servicing Transfer," <u>Appendix I</u>)

61. The "Borrower Welcome Letter" stated that the accrued interest was $93,194.43, slightly more than the $93,018.37 in the Land Home letter of August 12, 2020, and that the total amount of the debt was $197,914.59.

62. On information and belief such numbers were wrong and had resulted from regular imposition of excessive interest over the years.

63. The "Borrower Welcome Letter" stated that "Please be advised your loan terms may be adjusted once all loan documents have been received and/or reviewed."

64. Both the "Borrower Welcome Letter" and the "Notice of Servicing Transfer" directed Plaintiff to make monthly payments to FCI.

65. All actions of FCI as servicer of the debt were carried out on behalf of NDF1, LLC, as its agent.

66. On or about September 4, 2020, FCI sent Plaintiff a notice ("Subsequent Interest Rate Adjustment, <u>Appendix J</u>) inviting Plaintiff to "Refinance your loan / Sell your home and use the proceeds to pay off your current loan / Modify your loan terms / Payment forbearance temporarily gives you more time to pay your monthly payment."

67. These statements invited a settlement and implied that the debt was legally enforceable and invited settlement discussions ("modify your loan terms").

68. The document did not disclose that the debt was time-barred, that any action on the mortgage was also time-barred, and that any payment made in response could restart the statute of limitations.

69. It is the practice of NDF1 and FCI to not disclose when debts are time-barred, or that any payment made in response could restart the statute of limitations.

70. FCI did nothing to correct the false statement in its "Borrower Welcome Letter" that the accrued interest was $93,194.43, which was slightly more than the $93,018.37 in the

-8-

Land Home letter of August 12, 2020.

71.     On or about September 18, 2020, Plaintiff sent FCI a qualified written request pursuant to 12 U.S.C. §2605 requesting "an account history for this loan and a history of the interest rate calculations, from the inception of the loan to present." (Appendix K)

72.     FCI responded (Appendix L), but instead of providing an account history and a history of the interest rate calculations, it created and provided a "loan reinstatement calculation" (Appendix M) that miscalculated the interest.  For example, the correct interest rate for March-April 2016 was 5.65% (2.15% base rate plus 3.5%).  The "loan reinstatement calculation" computes the interest rate as 5.715% for the same period.

73.     The "loan reinstatement calculation" states that the accrued interest as of Sept. 20,  2020 is $72,939.07,  whereas a Land Home statement as of August 12, 2020 (Appendix F) gives the same interest figure as  $93,018.37 and FCI's "borrower welcome letter" (Appendix H) states that the accrued interest is $93,194.43 as of August 21, 2020.  The $72,939.07 is itself excessive.

74.     The purpose of the "loan reinstatement calculation" was to cover up and conceal the charging of excessive interest.

75.     As indicated by the "loan reinstatement calculation," FCI and its principal NDF1 were continuing to add interest to the account.

76.     FCI and its principal NDF1 have not sent a statement to Plaintiff each month setting forth accurate information as required by 15 U.S.C. §1637(b).

77.     Defendant NDF1, with the assistance of Land Home and FCI, has attempted to extract interest from Plaintiff and others that is not authorized by law or contract.

78.     Plaintiff was injured by the conduct complained of herein, in that:

        a.      Plaintiff was misled and confused.

        b.      Plaintiff's property was clouded by a purported lien in an inflated amount.

        c.      Plaintiff was forced to retain counsel and spend time and money dealing

with Defendants' conduct.

79.     On information and belief, Defendants are seeking to collect numerous loans that:

    a.     Are time-barred;

    b.     Have inflated balances as a result of the failure to adjust interest rates as required by the loan documents.

## COUNT I – DECLARATORY AND INJUNCTIVE RELIEF CLEARING TITLE

80.     Plaintiff incorporates paragraphs 1-79.

81.     This claim is against NDF1, LLC and FCI.

82.     The credit agreement and mortgage allegedly held by NDF1, LLC and allegedly serviced by FCI are both barred by limitations.

83.     NDF1, LLC and FCI still claim that they are entitled to payment and demand money for a release of the mortgage.

84.     Declaratory and / or injunctive relief are necessary to resolve the controversy.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and against Defendants:

    i.     Declaring that both the credit agreement and mortgage are barred by limitations, in a document recordable in the land records;

    ii.     Requiring that NDF1, LLC provide a release of the mortgage;

    iii.     Awarding costs;

    iv.     Granting such other or further relief as the Court deems proper.

## COUNT II – ILLINOIS CONSUMER FRAUD ACT

85.     Plaintiff incorporates paragraphs 1-79.

86.     Land Home, FCI and NDF1, LLC engaged in unfair and deceptive acts and practices, in violation of 815 ILCS 505/2, when:

    a.     On August 18, 2020, Land Home sent Plaintiff a "Mortgage Statement" on behalf of NDF1, LLC, which stated that "Failure to bring your loan

current may result in fees and foreclosure – the loss of your home" and included an incorrect interest rate and inflated numbers.

b.    On August 12, 2020, Land Home sent Plaintiff a letter on behalf of NDF1, LLC, containing incorrect numbers for the interest rate, amount of interest owed, and amount of the debt.

c.    On or about September 4, 2020, FCI sent Plaintiff a notice, on behalf of NDF1, LLC, that (i) invited Plaintiff to "Refinance your loan / Sell your home and use the proceeds to pay off your current loan / Modify your loan terms / Payment forbearance temporarily gives you more time to pay your monthly payment," (ii) concealed the fact that the wrong interest rate had been charged on the loan for some long period unknown to Plaintiff, (iii) invited settlement discussions and implied that the debt was legally enforceable ("modify your loan terms").

d.    FCI created and provided the "loan reinstatement calculation" to conceal the fact that excess interest had been charged.

e.    They failed to disclose when debts are time-barred, or that any payment could restart the statute of limitations.

87.    Defendants engaged in such conduct in the course of trade and commerce.

88.    Defendants engaged in such conduct for the purpose of obtaining money from Plaintiff and others.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and against Defendants for:

i.    Actual damages;

ii.    Punitive damages;

iii.    Attorney's fees, litigation expenses and costs of suit;

iv.    Such other and further relief as the Court deems proper.

## COUNT III – FDCPA

89.     Plaintiff incorporates paragraphs 1-79.

90.     Land Home, FCI and NDF1, LLC engaged in unfair and deceptive collection practices, in violation of 15 U.S.C. §§1692e, 1692e(2), 1692e(4), 1692e(5), 1692e(10), 1692f, and 1692f(1), when:

  a. On August 18, 2020, Land Home sent Plaintiff a "Mortgage Statement" on behalf of NDF1, LLC, which stated that "Failure to bring your loan current may result in fees and foreclosure – the loss of your home" and included an incorrect interest rate.

  b. On August 12, 2020, Land Home sent Plaintiff a letter on behalf of NDF1, LLC, containing incorrect numbers for the interest rate, amount of interest owed, and amount of the debt.

  c. On or about September 4, 2020, FCI sent Plaintiff a notice, on behalf of NDF1, LLC, that (i) invited Plaintiff to "Refinance your loan / Sell your home and use the proceeds to pay off your current loan / Modify your loan terms / Payment forbearance temporarily gives you more time to pay your monthly payment," (ii) concealed the fact that the wrong interest rate had been charged on the loan for some long period unknown to Plaintiff, (iii) invited settlement discussions and implied that the debt was legally enforceable ("modify your loan terms"), while failing to disclose that the debt was time-barred, or that any payment could restart the statute of limitations.

  d. FCI created and provided the "loan reinstatement calculation" to conceal the fact that excess interest had been charged.

91.     FCI and NDF1, LLC also violated the FDCPA, 15 U.S.C. §1692g(a), because the "Borrower Welcome Letter," also containing the 15 U.S.C. §1692g "notice of debt," contained

incorrect numbers for accrued interest and the amount of the debt, and stated that the "terms" were subject to revision, making it uncertain what the correct numbers were.

92.     Defendants engaged in such conduct for the purpose of obtaining money from Plaintiff and others.

93.     Section 1692e provides:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

(2)     The false representation of—

(A)     the character, amount, or legal status of any debt; . . .

(4)     The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5)     The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .

(10)    The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

94.     Section 1692f provides:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1)The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. . . .

95.     Section 1692g(a) provides:

§ 1692g.  Validation of debts

(a) Notice of debt; contents.  Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing–

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

-13-

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and against Defendants for:

i.      Actual damages;

ii.      Statutory damages;

iii.      Attorney's fees, litigation expenses and costs of suit;

iv.      Such other and further relief as the Court deems proper.

### COUNT IV – RESPA

96.      Plaintiff incorporates paragraphs 1-79.

97.      This claim is against FCI.

98.      FCI violates 12 U.S.C. §2605 when it responded to Plaintiff's qualified written request by creating the "loan reinstatement calculation" containing excessive interest charges.

99.      FCI's action was wilful.

100.      12 U.S.C. §2605(e) provides:

Duty of loan servicer to respond to borrower inquiries

(1)      Notice of receipt of inquiry

(A)      In general

If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays)

-14-

unless the action requested is taken within such period.

(B) Qualified written request  For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—

   (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

   (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry  Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall—

   (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

   (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

      (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

      (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

   (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

      (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

      (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower. . . .

101. 12 U.S.C. §2605(f) provides:

(f) Damages and costs  Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

(1) Individuals  In the case of any action by an individual, an amount equal to the sum of—

    (A) any actual damages to the borrower as a result of the failure; and

    (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000. . . .

(3) Costs

In addition to the amounts under paragraph (1) or (2), in the case of any successful action under this section, the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances. . . .

WHEREFORE, the Court should enter judgment in favor of Plaintiff and against Defendant FCI  for:

    i.    Actual damages;

    ii.    Statutory  damages;

    iii.     Attorney's fees, litigation expenses and costs of suit;

    iv.    Such other and further relief as the Court deems proper.

## COUNT V  – ILLINOIS INTEREST ACT

102.    Plaintiff incorporates paragraphs 1-79.

103.    Defendant NDF1 claims to be the successor to the Quicken loan agreement and to occupy the same status as a contracting party as Quicken.

104.    Defendants Land Home and FCI claim to have obtained assignments of the right to service the Quicken loan agreement and to be entitled to payment under such agreement.

105.    Defendants had no right to charge interest in excess of the amount provided in the loan documents or to add excessive interest to the lien on Plaintiff's property.

106.    815 ILCS 205/5 provides:

No person or corporation shall directly or indirectly accept or receive, in money, goods, discounts or thing in action, or in any other way, any greater sum or greater value for the loan, forbearance or discount of any money, goods or thing in action, than is expressly authorized by this Act or other laws of this State.

107.    815 ILCS 205/6 provides:

If any person or corporation knowingly contracts for or receives, directly or indirectly, by any device, subterfuge or other means, unlawful interest, discount or charges for or in connection with any loan of money, the obligor may, recover by means of an action or defense an amount equal to twice the total of all interest, discount and charges determined by the loan contract or paid by the obligor, whichever is greater, plus such reasonable attorney's fees and court costs as may be assessed by a court against the lender. The payments due and to become due including all interest, discount and charges included therein under the terms of the loan contract, shall be reduced by the amount which the obligor is thus entitled to recover. Recovery by means of a defense may be had at any time after the loan is transacted. Recovery by means of an action may be had at any time after the loan is transacted and prior to the expiration of 2 years after the earlier of (1) the date of the last scheduled payment of the loan after giving effect to all renewals or extensions thereof, if any, or (2) the date on which the total amount due under the terms of the loan contract is fully paid. A bona fide error in connection with a loan shall not be a violation under this section if the lender corrects the error within a reasonable time. . . .

WHEREFORE, the Court should enter judgment in favor of Plaintiff and against Defendants for:

i.      Statutory  damages;

ii.      Attorney's fees, litigation expenses and costs of suit;

iii.      Such other and further relief as the Court deems proper.

## **COUNT VI – TILA**

108.    Plaintiff incorporates paragraphs 1-79.

109.    This claim is against NDF1.

110.    Neither NDF1 nor its servicing agents have sent Plaintiff, during each month during the year preceding the filing of this action, a statement accurately setting forth the finance charges and other charges added to the account during such month.  In some instances incorrect information was provided.  In other instances no statement was sent.

111.    NDF1 therefore violated 15 U.S.C. §1637(b) and 12 C.F.R. §1026.7(a)

112.    Section 1637(b) provides:

(b) Statement required with each billing cycle. The creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth each of the following items to the extent applicable:

(1) The outstanding balance in the account at the beginning of the statement

-17-

period.

(2) The amount and date of each extension of credit during the period, and a brief identification, on or accompanying the statement of each extension of credit in a form prescribed by the Bureau sufficient to enable the obligor either to identify the transaction or to relate it to copies of sales vouchers or similar instruments previously furnished, except that a creditor's failure to disclose such information in accordance with this paragraph shall not be deemed a failure to comply with this chapter [15 USCS §§ 1631 et seq.] or this title [15 USCS §§ 1601 et seq.] if (A) the creditor maintains procedures reasonably adapted to procure and provide such information, and (B) the creditor responds to and treats any inquiry for clarification or documentation as a billing error and an erroneously billed amount under section 161 [15 USCS § 1666]. In lieu of complying with the requirements of the previous sentence, in the case of any transaction in which the creditor and seller are the same person, as defined by the Bureau, and such person's open end credit plan has fewer than 15,000 accounts, the creditor may elect to provide only the amount and date of each extension of credit during the period and the seller's name and location where the transaction took place if (A) a brief identification of the transaction has been previously furnished, and (B) the creditor responds to and treats any inquiry for clarification or documentation as a billing error and an erroneously billed amount under section 161 [15 USCS § 1666].

(3) The total amount credited to the account during the period.

(4) The amount of any finance charge added to the account during the period, itemized to show the amounts, if any, due to the application of percentage rates and the amount, if any, imposed as a minimum or fixed charge.

(5) Where one or more periodic rates may be used to compute the finance charge, each such rate, the range of balances to which it is applicable, and, unless the annual percentage rate (determined under section 107(a)(2) [15 USCS § 1606(a)(2)]) is required to be disclosed pursuant to paragraph (6), the corresponding nominal annual percentage rate determined by multiplying the periodic rate by the number of periods in a year.

(6) Where the total finance charge exceeds 50 cents for a monthly or longer billing cycle, or the pro rata part of 50 cents for a billing cycle shorter than monthly, the total finance charge expressed as an annual percentage rate (determined under section 107(a)(2) [15 USCS § 1606(a)(2)]), except that if the finance charge is the sum of two or more products of a rate times a portion of the balance, the creditor may, in lieu of disclosing a single rate for the total charge, disclose each such rate expressed as an annual percentage rate, and the part of the balance to which it is applicable.

(7) The balance on which the finance charge was computed and a statement of how the balance was determined. If the balance is determined without first deducting all credits during the period, that fact and the amount of such payments shall also be disclosed.

(8) The outstanding balance in the account at the end of the period.

(9) The date by which or the period (if any) within which, payment must be made

to avoid additional finance charges, except that the creditor may, at his election and without disclosure, impose no such additional finance charge if payment is received after such date or the termination of such period.

(10) The address to be used by the creditor for the purpose of receiving billing inquiries from the obligor.

(11)

    (A) A written statement in the following form: "Minimum Payment Warning: Making only the minimum payment will increase the amount of interest you pay and the time it takes to repay your balance.", or such similar statement as is established by the Bureau pursuant to consumer testing.

    (B) Repayment information that would apply to the outstanding balance of the consumer under the credit plan, including—

        (i) the number of months (rounded to the nearest month) that it would take to pay the entire amount of that balance, if the consumer pays only the required minimum monthly payments and if no further advances are made;

        (ii) the total cost to the consumer, including interest and principal payments, of paying that balance in full, if the consumer pays only the required minimum monthly payments and if no further advances are made;

        (iii) the monthly payment amount that would be required for the consumer to eliminate the outstanding balance in 36 months, if no further advances are made, and the total cost to the consumer, including interest and principal payments, of paying that balance in full if the consumer pays the balance over 36 months; and

        (iv) a toll-free telephone number at which the consumer may receive information about accessing credit counseling and debt management services.

    (C)

        (i) Subject to clause (ii), in making the disclosures under subparagraph (B), the creditor shall apply the interest rate or rates in effect on the date on which the disclosure is made until the date on which the balance would be paid in full.

        (ii) If the interest rate in effect on the date on which the disclosure is made is a temporary rate that will change under a contractual provision applying an index or formula for subsequent interest rate adjustment, the creditor shall apply the interest rate in effect on the date on which the disclosure is made for as long as that interest rate will apply under that contractual provision, and then apply an interest rate based on the index or formula in effect on the

applicable billing date.

(D) All of the information described in subparagraph (B) shall—

(i) be disclosed in the form and manner which the Bureau shall prescribe, by regulation, and in a manner that avoids duplication; and

(ii) be placed in a conspicuous and prominent location on the billing statement.

(E) In the regulations prescribed under subparagraph (D), the Bureau shall require that the disclosure of such information shall be in the form of a table that—

(i) contains clear and concise headings for each item of such information; and

(ii) provides a clear and concise form stating each item of information required to be disclosed under each such heading.

(F) In prescribing the form of the table under subparagraph (E), the Bureau shall require that—

(i) all of the information in the table, and not just a reference to the table, be placed on the billing statement, as required by this paragraph; and

(ii) the items required to be included in the table shall be listed in the order in which such items are set forth in subparagraph (B).

(G) In prescribing the form of the table under subparagraph (D), the Bureau shall employ terminology which is different than the terminology which is employed in subparagraph (B), if such terminology is more easily understood and conveys substantially the same meaning. . . .

113.    12 C.F.R. §1026.7(a) provides:

§1026.7   Periodic statement.

The creditor shall furnish the consumer with a periodic statement that discloses the following items, to the extent applicable:

(a) Rules affecting home-equity plans. The requirements of paragraph (a) of this section apply only to home-equity plans subject to the requirements of §1026.40. Alternatively, a creditor subject to this paragraph may, at its option, comply with any of the requirements of paragraph (b) of this section; however, any creditor that chooses not to provide a disclosure under paragraph (a)(7) of this section must comply with paragraph (b)(6) of this section.

(1) Previous balance. The account balance outstanding at the beginning of the billing cycle.

(2) Identification of transactions. An identification of each credit transaction in accordance with §1026.8.

(3) Credits. Any credit to the account during the billing cycle, including the amount and the date of crediting. The date need not be provided if a delay in accounting does not result in any finance or other charge.

(4) Periodic rates.

> (i) Except as provided in paragraph (a)(4)(ii) of this section, each periodic rate that may be used to compute the finance charge, the range of balances to which it is applicable, and the corresponding annual percentage rate. If no finance charge is imposed when the outstanding balance is less than a certain amount, the creditor is not required to disclose that fact, or the balance below which no finance charge will be imposed. If different periodic rates apply to different types of transactions, the types of transactions to which the periodic rates apply shall also be disclosed. For variable-rate plans, the fact that the periodic rate(s) may vary.

> (ii) Exception. An annual percentage rate that differs from the rate that would otherwise apply and is offered only for a promotional period need not be disclosed except in periods in which the offered rate is actually applied.

(5) Balance on which finance charge computed. The amount of the balance to which a periodic rate was applied and an explanation of how that balance was determined. When a balance is determined without first deducting all credits and payments made during the billing cycle, the fact and the amount of the credits and payments shall be disclosed.

(6) Amount of finance charge and other charges. Creditors may comply with paragraphs (a)(6) of this section, or with paragraph (b)(6) of this section, at their option.

> (i) Finance charges. The amount of any finance charge debited or added to the account during the billing cycle, using the term finance charge. The components of the finance charge shall be individually itemized and identified to show the amount(s) due to the application of any periodic rates and the amounts(s) of any other type of finance charge. If there is more than one periodic rate, the amount of the finance charge attributable to each rate need not be separately itemized and identified.

> (ii) Other charges. The amounts, itemized and identified by type, of any charges other than finance charges debited to the account during the billing cycle.

(7) Annual percentage rate. At a creditor's option, when a finance charge is imposed during the billing cycle, the annual percentage rate(s) determined under §1026.14(c) using the term annual percentage rate.

(8) Grace period. The date by which or the time period within which the new balance or any portion of the new balance must be paid to avoid additional finance charges. If such a time period is provided, a creditor may, at its option and without disclosure, impose no finance charge if payment is received after the time period's expiration.

(9) Address for notice of billing errors. The address to be used for notice of billing errors. Alternatively, the address may be provided on the billing rights statement permitted by §1026.9(a)(2).

(10) Closing date of billing cycle; new balance. The closing date of the billing cycle and the account balance outstanding on that date.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and against

Defendant NDF1 for:

        i.      Statutory damages;

        ii.     Attorney's fees, litigation expenses and costs of suit;

        iii.    Such other and further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
Tara L. Goodwin
**EDELMAN, COMBS, LATTURNER**
    **& GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:
courtecl@edcombs.com

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

<u>*/s/ Daniel A. Edelman*</u>
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC**
20 S. Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)